# EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT EUGENE M. DIFIORE

I, Special Agent Eugene M. DiFiore, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately eleven years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts, from 1995 to 1999. I was also a police officer with the Amesbury Police Department in Amesbury, Massachusetts, beginning in 1999, until I accepted a position as a criminal investigator with the DEA in 2005.

3. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following property:

$100,000 in United States currency, seized from Daniel R. Ormond on May 26, 2016, at Boston Logan International Airport (the "Currency").

5. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for the forfeiture of the Currency.

6. This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

7. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

## The Seizure of the Currency

8. Less than twenty-four hours prior to the intended departure time on May 26, 2016, Daniel R. Ormond ("Ormond") booked a one-way flight, Southwest Airlines Flight #603, from Boston, Massachusetts, to Baltimore, Maryland, and then connecting on Southwest Airlines Flight #661, from Baltimore, Maryland, to Oakland, California.

9. On May 26, 2016, at approximately 5:30 am, the Transportation Security Administration ("TSA") agents assigned to Terminal A (Southwest Airlines Checkpoint) at Logan International Airport located in Boston, Massachusetts, requested assistance from LATF agents. TSA agents reported that a passenger, later identified as Ormond, attempted to pass

2

through the TSA security checkpoint with what appeared to be a large amount of currency in his carry-on duffle bag. TSA agents described the currency as evenly stacked bundles that were strapped to flat pieces of cardboard – similar to the shape and size of a paperback book – which was also covered in carbon-paper and gift wrapped. According to the TSA agents, the currency was packaged in a manner designed to thwart detection. There were a total of two gift wrapped packages in Ormond's carry-on bag. LATF agents and I responded to TSA's request to investigate further. When we arrived, we were directed to Ormond.

10. Ormond agreed to speak with us regarding his travel plans and the origin of the Currency in his carry-on bag. We told Ormond that he was not under arrest, not obligated to speak with us, and was free to leave at any time.

11. When asked about the Currency in his bag, Ormond initially denied having any knowledge of the Currency. He then changed his story. Ormond stated that he booked his flight the night before his scheduled departure and was traveling to California to attend his cousin's graduation. Ormond further stated that his cousin, Brian Griswald ("Griswald"), was graduating from Palo Alto High School in California. He said that he packed his own bag and that it contained two gift wrapped books given to him by his mother the night before as a graduation present for his cousin. No books of any kind were found in the bag. Th only items found in the wrapped packages were the Currency, carbon paper, and cardboard. He also said that he planned to stay with his cousin in San Jose, California, during his visit.

12. When we informed Ormond that we knew the "books" in his bag were instead substantial amount of currency, he became extremely nervous. His hands began shaking and his forehead began perspiring.

13. When we asked him about the Currency and the manner in which it was packaged, Ormond insisted that the wrapped items were books and that he had no idea that they contained currency. He also repeated that his mother gave him the books, gifts for his cousin, the previous night. When asked if his mother could or would confirm his story, Ormond replied, "I'm not sure."

14. We than asked Ormond about his mother's employment, including questions regarding her annual salary and how she obtained the Currency. In response, Ormond said that his mother worked with "the mentally challenged" for the Commonwealth of Massachusetts. He did not provide an explanation regarding how or why his mother would attempt to conceal a large amount of currency. We also inquired about his father, and Ormond said that his parents were divorced and that his father was not involved in his life. He added that he lived with his mother in Brewster, Massachusetts.

15. While we were speaking with Ormond, he received a brief call on his cellular phone. When we inquired about the call, Ormond stated that it was his friend, Billy Antenor ("Antenor"), who Ormond claimed to have met when he was a student at Bunker Hill Community College. Ormond disclosed that he had stayed with Antenor the previous night and that Antenor had driven him to the airport. Ormond also told us that Antenor was calling to see if he got on the plane without any issues.

16. Based on the lack of information Ormond was able to provide regarding the Currency and the inconsistencies in the story he told us, we invited Ormond to the MSP Troop F Barracks (the "Barracks") to speak with us further regarding the Currency. We reminded him that he was under no obligation to speak with us and informed him that he was not under arrest

and free to leave at any time. Ormond told us that he understood and agreed to come with us to the Barracks.

17. When we inquired again about the origin of the Currency, Ormond told us the same story but added that he did not see his mother wrap the two packages. He also emphasized that he did not know that a large amount of currency was in his bag. We then asked Ormond whether his fingerprints would be found on the wrapping paper, and in response, he said that he helped his mother wrap one of the packages. Based on his response, we asked how he was unaware of the contents of the packages if he helped wrap at least one of them, and Ormond then changed his story and said that he knew that the packages contained currency. After probing further regarding his mother's involvement in packaging the Currency, Ormond said that his mother did not give him the Currency nor did she wrap the packages. This time, he said that an unnamed family member gave the Currency to another unnamed family member. He then said, "That's all I can say."

18. During the course of our conversation, Ormond told us that he was a full time student at the University of Massachusetts in Lowell, Massachusetts. When we told him that we could verify the information, Ormond said he was not a student at all. We also inquired about his mother's employment again, and this time, Ormond told us that she was unemployed. When we asked if there were any other statements that he would like to correct, Ormond stated he was not sure if Antenor lived in Malden or Medford, Massachusetts. We then asked Ormond whether Antenor had any connection to the Currency and why Antenor asked him if he was able to get on the plane without any issues. In response, Ormond started mumbling and shrugging his shoulders. Ormond then stated that Antenor was simply a ride to the airport and that the

prior night he parked his car at Antenor's home. When we inquired about the location of Antenor's home, Ormond could not recall the street address or the city in which Antenor lived. After stating several times that Antenor drove him to the airport, Ormond later said that his girlfriend, Malina Chan ("Chan"), dropped him at the airport.

19. While we were speaking with Ormond, we ran a criminal history check, and learned that Ormond had been arrested in late 2008 for Felony Possession of Marijuana with Intent to Distribute (Marijuana) by the Nebraska State Patrol, Buffalo County, Nebraska, and in 2007 for Possession of a Class D Substance (Marijuana) in Eastham, Massachusetts, which was continued without a finding. When we inquired about these, Ormond denied that he had been arrested. Based on his response, we obtained a copy of the arrest report prepared by the Nebraska State Patrol, which indicated that Ormond and two other individuals were traveling across the country from Northern California, and had been stopped and arrested. As a result, Ormond was charged, among other charges, with Possession with Intent to Distribute, approximately 4.4 pounds of Marijuana and later was convicted of Attempt of a Class 3A or Class 4 Felony. We also received a copy of the booking photograph of Ormond in connection with his arrest in 2008. We confirmed that the man in the booking photograph was, in fact, Ormond.

20. We also contacted Ormond's mother, Valerie Ormond ("Valerie"), and she said that she did not know that Ormond was traveling to California. She also denied giving him any books, gifts, or money to take to California. We also inquired about Griswald's graduation, and Valerie stated that she had family relatives who lived in California. She was not, however, aware of any relative with the name "Brian." She also said that she had no knowledge that any

of her nieces or nephews were graduating from high school in California. Valerie also provided information regarding Ormond's living arrangement, stating that Ormond stayed mostly with his father and sometimes at his girlfriend's house.

21. After we spoke with his mother, Ormond was visibly upset and withdrew from the conversation. He then asked whether he could have a receipt for the Currency if we were not planning to return it to him. We then told Ormond that we were going to seize the Currency, and we provided him with a receipt.

22. After ending the conversation with Ormond, we requested the assistance of a MSP K-9, certified in narcotics detection. As a result of our request for assistance, Sergeant Patrick Silva ("Sgt. Silva") and his K-9 partner Charbo ("Charbo") were dispatched to the Barracks for further assistance.

23. Charbo is a two-year-old German Shepherd that is used in the detection of controlled substances in different situations including, but not limited to, drug interdiction investigations. Sgt. Silva and K-9 Charbo have attended, and successfully completed, well over five hundred hours in narcotic detection training, including marijuana, cocaine, heroin, and methamphetamine. Sgt. Silva and K-9 Charbo received accreditation for narcotic odor detection through the New England State Police Conference, and continue to obtain re-certification, most recently on May 24, 2016. Since the initial training class, Sgt. Silva and K-9 Charbo have maintained and updated training at a minimum of two days per month.

24. Upon arrival, Charbo stayed in the police cruiser while the Currency was placed randomly in the inside of a file cabinet drawer, out of plain view, in an office inside the Barracks without Sgt. Silva's knowledge. A short time later, Sgt. Silva brought Charbo to the office, and

within seconds of instructing Charbo to conduct a search, Sgt. Silva advised us that Charbo had alerted to the odor of narcotics coming from the file cabinet drawer that contained the Currency.

25. The Currency was then processed, secured, and counted. The total amount of the currency was $100,000, which consisted of 1,000 - $100 bills.

## CONCLUSION

Based on the information provided above, I have probable cause to believe that the Currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846. Accordingly, the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

Signed under the pains and penalties of perjury, this 26th day of October 2016.

_____
Eugene M. DiFiore, Special Agent
United States Drug Enforcement Administration