UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )     CIVIL ACTION NO.
                              )     16-12166-DPW
v.                            )
                              )
$100,000 IN UNITED STATES     )
CURRENCY,                     )
                              )
            Defendant,        )
                              )
DANIEL R. ORMOND,             )
                              )
            Claimant.         )

MEMORANDUM AND ORDER
March 30, 2018

In this case the United States seeks *in rem* forfeiture of $100,000 in currency.  The United States alleges that the currency is subject to forfeiture because it was connected to illegal drug activity.  Daniel Ormond has filed a claim to the currency.  Before me are cross-motions for summary judgment.

**I. BACKGROUND**

**A.   *Factual Background***

   1.   The Seizure of the Defendant Currency

On May 26, 2016, members of the Logan Airport Task Force ("LATF") seized the res, $100,000 in United States currency, from the claimant, Daniel Ormond.  Mr. Ormond was ticketed to travel to Oakland, California on Southwest Airlines, with a connecting flight in Baltimore, Maryland.

On the morning of May 26, 2016, after receiving a request from Transportation Security Administration ("TSA") agents for assistance, Massachusetts State Police ("MSP") Sergeant John Tasker was dispatched to the Southwest Airlines checkpoint in Terminal A at Logan Airport in Boston, Massachusetts. TSA agents reported that a passenger, later identified as Mr. Ormond, had attempted to pass through the TSA security checkpoint with what appeared to be a large amount of currency in his carry-on duffle bag. TSA agents described the Defendant Currency as evenly stacked bundles that were strapped to flat pieces of cardboard – similar to the shape and size of a paperback book. The bundles were covered in carbon-paper and gift wrapped. Two such "gift wrapped" packages were in Mr. Ormond's carry-on bag.

Mr. Ormond's airline ticket on Southwest Airlines on May 26, 2016 was listed as "Non-Revenue Ticket." Non-revenue designations are for those travelers traveling on a Southwest Airlines Guest Pass. A Guest Pass is valid for "Space Available (standby) travel" only. A person flying in this standby status is subject to removal from a flight at any point in order to accommodate revenue Customers or Pass Travelers with a higher priority. Such a person may only obtain a security document to proceed through the security checkpoint and wait at the gate for seat availability. This security document may only be obtained

up to 24 hours in advance of travel and the traveler may only
add his name to the standby list two hours prior to departure.

MSP Trooper Baldwin Leon and Drug Enforcement
Administration ("DEA") Special Agent Eugene DiFiore assisted
Sgt. Tasker with the investigation of the Defendant Currency.
Mr. Ormond spoke to the investigators present regarding his
travel plans and the origin of the Defendant Currency found in
his carry-on luggage.  When asked about the Defendant Currency
in his luggage, Mr. Ormond initially denied possessing a large
amount of currency.  Mr. Ormond stated that he was traveling to
California to attend the graduation of his cousin, Brian
Griswald, from Palo Alto High School and that he planned to stay
with his cousin in San Jose, California during his visit.  Mr.
Ormond's mother, in a deposition, however, stated that Mr.
Ormond did not have a cousin named "Brian Griswald," nor did he
have any cousins who graduated from Palo Alto High School with
that last name.[1]

Mr. Ormond further stated that he packed his own bag and
that it contained two gift-wrapped books given to him by his
mother the night before as a graduation present for his cousin.
When asked about the Defendant Currency and the manner in which
it was packaged, Mr. Ormond stated that the wrapped items were

---

[1] Mr. Ormond apparently does, however, have cousins who live in
Southern California with the last name "Griswald."

books and that he had no idea that they contained currency.  In her deposition, however, Mr. Ormond's mother testified that she did not give him gift-wrapped books to give to any relatives. Rather, she testified that she was not aware of the existence of the Defendant Currency and that she did not give Mr. Ormond the Defendant Currency.  In fact, she testified that she did not have the financial means to give Mr. Ormond $100,000 in May 2016.

While Mr. Ormond was talking with Sgt. Tasker, Trooper Leon, and SA DiFiore, he received and answered a phone call from Billy Antenor.  Mr. Ormond told Sgt. Tasker, Trooper Leon, and SA DiFiore that he stayed with Mr. Antenor the previous night and that Mr. Antenor had driven him to the airport prior to his flight.  He told them that Mr. Antenor was calling to inquire if Mr. Ormond had gotten on the plane without any issues.

At this point, Trooper Leon told Mr. Ormond that he did not believe him and that a further investigation was needed regarding the origin of the Defendant Currency.  Mr. Ormond subsequently accompanied the officials to the Massachusetts State Police Troop F Barracks.  Thereafter, MSP Detective Lieutenant Thomas Coffey contacted MSP Sgt. Patrick Silva and requested the assistance of a K-9 and handler trained in the detection of narcotics odors.  Sgt. Silva notified Det. Lt. Coffey that he would be responding with K-9 Charbo.

MSP Trooper Christopher Fraser was also requested to assist with the investigation of the origin of the Defendant Currency. Mr. Ormond told Trooper Fraser that he did not see his mother wrap the two packages she gave him. However, when Trooper Fraser asked if there would be any reason Mr. Ormond's fingerprints could be found on the inside of the wrapping paper with which the Defendant Currency was wrapped, Mr. Ormond responded that he helped his mother wrap one of the packages. During these later discussions, Mr. Ormond stated that he knew the packages contained currency. Mr. Ormond then told Trooper Fraser that his mother did not give him the currency nor did she wrap the packages that contained the currency. Mr. Ormond told Trooper Fraser that an unnamed family member gave him the currency to give to another unnamed family member. Mr. Ormond then stated, "That's all I can say."

Trooper Fraser further inquired about Mr. Ormond's phone call with Mr. Antenor, whether Mr. Antenor had any relationship to the Defendant Currency and why Mr. Antenor inquired about whether Mr. Ormond boarded the plane without any issues. Mr. Ormond told him that Mr. Antenor gave him a ride to the airport that morning. When Trooper Fraser asked for Mr. Antenor's address, Mr. Ormond was not able to provide the address. He was unsure whether Mr. Antenor lived in Malden or Medford,

Massachusetts.  Mr. Ormond then said that his girlfriend, not Mr. Antenor, had brought him to the airport.

Meanwhile, SA DiFiore researched Mr. Ormond's criminal history and provided the results to Trooper Fraser.  Trooper Fraser reviewed the report and confirmed that Mr. Ormond had previously been arrested for a drug offense in Nebraska.

At some later point, Mr. Ormond told Trooper Fraser that he no longer wanted to speak with him and the other investigators and said "I don't understand the legality of it," and then asked: "If I'm not getting my money back, could I have a receipt?"  Trooper Fraser told Mr. Ormond that the Defendant Currency was going to be seized pending further investigation and an examination by a MSP K-9 certified to detect narcotics odor, but that he was free to leave.  Trooper Leon told Mr. Ormond that he would receive a receipt after the completion of the K-9 examination and after the Defendant Currency was counted.

In preparation for the K-9 examination, LATF investigators hid the Defendant Currency in the inside of a file cabinet drawer, out of plain view, in an office inside the Barracks. They did not disclose the location to Sgt. Silva.  Sgt. Silva arrived at the Barracks at approximately 11:30 a.m. and was directed to the second floor.  Sgt. Silva and K-9 Charbo went inside the office space where the Defendant Currency was hidden.

After K-9 Charbo was released, he immediately turned to the right and examined the lower-right hand drawer of a desk within the office.  Sgt. Silva saw K-9 Charbo display deep inhalations, and then K-9 Charbo "downed" towards the drawer.  Sgt. Silva notified Det. Lt. Coffey and SA DiFiore, and they told Sgt. Silva that the Defendant Currency was hidden in the drawer identified by K-9 Charbo.

### 2.  Mr. Ormond's Travels between Boston and California

Mr. Ormond traveled between Boston and California twice in the month before the seizure of the Defendant Currency.

On April 21, 2016, Mr. Ormond flew from Los Angeles, California to Sacramento, California.  The next day he flew from Sacramento to Denver, Colorado, and then from Denver to Boston.  Mr. Ormond booked both flights on the date of departure and brought no checked luggage with him.

On May 7, 2016, Mr. Ormond traveled from Boston to Los Angeles, with a layover in Milwaukee, Wisconsin.

### 3.  Mr. Ormond's Relationship with Mr. Antenor

Mr. Ormond told LATF officers that Mr. Antenor was a friend he met while attending Bunker Hill Community College.  Mr. Antenor enrolled at Bunker Hill on April 30, 2010.  Mr. Ormond enrolled at Bunker Hill on December 21, 2012.  The two met when Mr. Antenor walked into one of Mr. Ormond's classes to discuss

"app building," and Mr. Ormond offered to help Mr. Antenor. Thereafter, they began working on their nightclub "app."

Mr. Antenor and Mr. Ormond traveled to California in early 2016 to visit Mr. Ormond's uncle. In his deposition, however, Mr. Antenor could not recall the name of Mr. Ormond's uncle, or the location where they stayed. Mr. Antenor said that they went on this trip to obtain an investor for their app. They did not, however, meet with any investors during their trip to California. In fact, they had not set up any meetings with investors in advance of the California trip. After this trip, Mr. Antenor lost contact with Mr. Ormond. Nonetheless, the two were on the same flight together leaving Logan Airport on May 26, 2016.

### 4.    Mr. Antenor's Trips between Boston and California

From April 28, 2016 to June 3, 2016, Mr. Antenor made several trips between Boston and California.

On April 28, 2016, he traveled from Boston to Los Angeles, with a layover in Baltimore. The April 28, 2016 flight was booked on the day of departure and Mr. Antenor brought no checked luggage on the trip.

On May 1, 2016, Mr. Antenor traveled to Boston from Los Angeles, with a layover in Milwaukee. On the same day, he also reserved a flight from Los Angeles to Boston, this reservation included a layover in Denver. Again, the flights were booked on

the day of departure and Mr. Antenor brought no checked luggage on the trip he took.

On May 7, 2016, the same day that Mr. Ormond traveled from Boston to Los Angeles with a layover in Milwaukee, Mr. Antenor traveled from Boston to Los Angeles, with a layover in St. Louis, Missouri.  On that day, Mr. Antenor also reserved a flight from Boston to Baltimore.  The flight Mr. Antenor took on May 7, 2016 was booked on the day of departure and Mr. Antenor brought no checked luggage on the trip.

On May 15, 2016, Mr. Antenor traveled from Los Angeles to Boston, with a layover in Indianapolis.  In a pattern similar to his previous booking, Mr. Antenor again reserved an additional flight from Los Angeles to Boston, with a layover in Denver. The flights again were booked the day of departure and Mr. Antenor brought no checked luggage on the trip he actually took.

On May 26, 2016, Mr. Antenor traveled from Boston to Los Angeles, leaving on the same flight as the one Mr. Ormond booked.

On June 3, 2016, Mr. Antenor traveled from Los Angeles to Boston, with a layover in Milwaukee.  The flight was booked on the day of departure and Mr. Antenor brought no checked luggage on the trip.

5.  Deposition of Confidential Witness

The United States took the deposition of a Confidential

Witness ("CW") on November 1, 2017.[2]  The CW had been introduced to Mr. Antenor several years before by a former friend.  The two were reintroduced in Boston in late 2015.  The CW went to California with Mr. Antenor on at least three separate occasions via buddy passes on Southwest Airlines.  According to the CW, Mr. Antenor had a friend who worked for the airline and was supplying him with the buddy passes.

Their first trip to Los Angeles was on April 28, 2016. Prior to leaving Boston, Mr. Antenor prepared money and put it in the CW's bag.  When they arrived, Mr. Antenor introduced the CW to Zachary Trotter.  The CW testified that its duties working for Mr. Trotter and Mr. Antenor included transporting money from Boston to California, packaging marijuana to be sent to Massachusetts, and mailing off the packages to Boston.

The CW met Mr. Ormond on one of its trips to Los Angeles when Mr. Ormond came to Los Angeles for a short time.  The CW stated that Mr. Ormond "was one of the other guys, aside from [Mr. Antenor], that was helping [Mr. Trotter] distribute the weed over [] in Boston." According to the CW, Mr. Ormond and Mr. Antenor retrieved the boxes that were shipped to Massachusetts.

---

[2] This deposition followed motion practice in which the government sought to supplement its summary judgment submissions.  I permitted supplementation after directing that Mr. Ormond's counsel be permitted to participate in the deposition of the CW.

The CW also indicated that it "never saw [Mr. Ormond] sell any
weed, but . . . kn[e]w that it was responsible for bringing the
money back."

On May 26, 2016, the CW testified that it flew from Boston
to Los Angeles, on the same flight that Mr. Ormond was supposed
to be on.  The night before, the CW went to Mr. Antenor's house
and he tried to place the money in the CW's bag so that "the x-
rays couldn't see.  He said if it was placed flat on the bottom
of the bag that it wouldn't be detected."  To the CW's
knowledge, it only had $10,000 in its possession in its carry
on.

The CW further testified that Mr. Antenor told it that Mr.
Ormond "was carrying more than he should be.  But, he figured
out a way that he could do it."  The CW stated that Mr. Antenor
said he told Mr. Ormond not to do it.  The CW indicated that Mr.
Antenor told it that Mr. Ormond "wrapped the money in carbon
paper.  And because it was wrapped up like a gift in carbon
paper, that the x-rays wouldn't be able to see through the
carbon paper, that it would bounce back."

## B.    *Procedural Background*

On October 26, 2016, the United States filed a verified
complaint for forfeiture *in rem*.  The complaint alleges that
"$100,000 in United States currency, seized from Daniel R.
Ormond on May 26, 2016, at Boston Logan International Airport

(the 'Currency')" is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation."

On December 19, 2016, Mr. Ormond filed a verified claim pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, alleging that he is the owner of the $100,000 in U.S. currency. On January 9, 2017, Mr. Ormond filed an answer to the complaint, asserting that the complaint failed to state a claim on which relief may be granted, that no probable cause exists to believe that the currency is subject to forfeiture, that the search and seizure of the currency violated the Fourth Amendment, and that Mr. Ormond was detained in violation of the Fourth Amendment. No other persons or entities filed claims with respect to the currency and the opportunity to do so has expired.

On August 15, 2017, the United States filed a motion for summary judgment arguing that "(1) the Defendant Currency is forfeitable property pursuant to 21 U.S.C. § 881(a)(6); and (2) the Claimant is not the owner of the Defendant Currency and

cannot establish that he is an innocent owner of the Defendant Currency." In response, on September 15, 2017, Mr. Ormond filed a cross-motion for summary judgment arguing that "(1) Ormond is the owner of the Defendant Property, $100,000 in United States Currency, which was seized from him on May 26, 2016 at Logan Airport, Boston, Massachusetts; and (2) The government cannot sustain its burden of proving by a preponderance of the evidence that the Defendant Property is substantially connected to an illegal transaction as required under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 983(c)(3)."

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." *Borges ex rel. S.M.B.W.* v. *Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). "A fact is 'material' if its existence or nonexistence has a potential to change the outcome of the suit." *Id*. at 5.

Under the protocols for summary judgment practice, "[t]he moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions

of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." *Id.* Once the moving party has satisfied his burden, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Id.* If the nonmoving party "fails to make this showing, then summary judgment is appropriate." *Id.*

Ultimately, "[c]ross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc.* v. *Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). Consequently, "a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Dan Barclay, Inc.* v. *Stewart & Stevenson Servs., Inc.*, 761 F. Supp. 194, 197–98 (D. Mass. 1991).

### III. ANALYSIS

The First Circuit has emphasized that "[t]o carry its burden in a civil forfeiture action, the government must satisfy the requirements of both the applicable forfeiture statute and the Civil Asset Forfeiture Reform Act of 2000 ('CAFRA'), the

14

relevant portions of which have been codified in 18 U.S.C. §
983(c)." *United States* v. *One Parcel of Real Prop. with Bldgs.,
Appurtenances & Improvements k/a 45 Claremont St.*, 395 F.3d 1, 3
(1st Cir. 2004) (per curiam).  Under CAFRA "the Government's
burden to prove that certain property is subject to forfeiture
was 'increased . . . from mere probable cause (the old standard)
to the preponderance of the evidence.'"  *United States* v. *6 Fox
St.*, 480 F.3d 38, 42 (1st Cir. 2007).  Furthermore, "if the
Government's theory of forfeiture is that the property was used
to commit or facilitate the commission of a criminal offense, or
was involved in the commission of a criminal offense, the
Government shall establish that there was a substantial
connection between the property and the offense."  18 U.S.C. §
983 (c)(3).

     Nevertheless, "even if the government satisfies the
requirements of [the applicable forfeiture statute] and 983(c),
it does not necessarily follow that there will be a forfeiture."
*One Parcel of Real Prop. with Bldgs., Appurtenances &
Improvements k/a 45 Claremont St.*, 395 F.3d at 4.  Section
983(d) provides that "[a]n innocent owner's interest in property
shall not be forfeited under any civil forfeiture statute.  The
claimant shall have the burden of proving that the claimant is
an innocent owner by a preponderance of the evidence."  18
U.S.C. § 983 (d)(1); *see also United States* v. *Currency, U.S.,*

*$864,400.00*, 405 F. App'x 717, 718 (4th Cir. 2010) (per curiam) ("Once the government meets its burden, the burden shifts to the claimant to show, by a preponderance of the evidence, that he is an 'innocent owner' of the defendant property.").

**A.** ***The Motion of the United States for Summary Judgment***

<u>1.</u>  <u>Is the Defendant Currency Forfeitable Pursuant to 21 U.S.C. § 881(a)(6)?</u>

The United States contends that the Defendant Currency is forfeitable pursuant to 21 U.S.C. § 881(a)(6) because, based on the totality of the circumstances, it is more likely than not that the Defendant Currency is connected to drug trafficking. Section 881(a)(6) provides that "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter" shall be subject to forfeiture to the United States.

The government's burden does not require specificity with respect to the alleged drug transactions. "Although the government must show that 'the property was connected with illegal drug transactions,' it need not 'link[ ] the property to a particular transaction.'" *United States* v. *Assorted Jewelry*

*Approximately Valued of $44,328.00*, 833 F.3d 13, 15 (1st Cir. 2016) (quoting *United States* v. *1933 Commonwealth Ave.*, 913 F.2d 1, 3 (1st Cir. 1990)); *see also United States* v. *$11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013) ("The government may meet its burden with sufficiently strong circumstantial evidence linking the currency to drug trafficking *in general*.") (emphasis added); *United States* v. *$21,055.00 in U.S. Currency*, 778 F. Supp. 2d 1099, 1103 (D. Kan. 2011) ("[T]he government is not required to show that the currency is the proceeds of a particular drug transaction.").

As a general proposition, "[t]he usual evidence in a currency seizure case is a dog sniff, a quantity of currency, an unusual manner of packaging and the claimant's implausible story, which is together sufficient to meet the government's preponderance standard." *$21,055.00 in U.S. Currency*, 778 F. Supp. 2d at 1104 (quoting *United States* v. *$42,500.00 in U.S. Currency,* 283 F.3d 977, 984 n.1 (9th Cir. 2002)). "The aggregation of [these] facts, each one insufficient standing alone, may suffice to meet the government's burden." *United States* v. *$67,220.00 in U.S. Currency*, 957 F.2d 280, 284 (6th Cir. 1992). I will address the facts individually to understand whether in the aggregate they meet the government's burden.

### a. Mr. Ormond's Travel Arrangements

Mr. Ormond traveled to and from California several times in

the month before the seizure of the Defendant Currency.  On
April 21, 2016, he flew from Los Angeles to Sacramento.  The
next day he flew from Sacramento to Denver, and then from Denver
to Boston.  Mr. Ormond booked both flights on the date of
departure and brought no checked luggage with him.  On May 7,
2016, Mr. Ormond traveled from Boston to Los Angeles, with a
layover in Milwaukee.  On May 26, 2016, the day of the Defendant
Currency seizure, Mr. Ormond was scheduled to travel from Boston
to Baltimore, and then to Oakland.  Mr. Ormond contends that
"booking his ticket 24 hours in advance of travel was the only
way [he] could travel" because of the "Guest Pass ticket" he
had.  Although this may be a somewhat adequate explanation for
his last minute travel arrangements, he does not provide a
meaningful explanation of the reasons for his California travels
in the first place.  Traveling on a guest/buddy pass does not
immunize same day travel from careful analysis regarding its
purposes.

     SA DiFiore's affidavit asserts that Northern California, a
location in general proximity to the places in California where
Mr. Ormond was traveling by air, is well-known for its source of
marijuana supply.  Notably, the LATF agents have knowledge and
experience regarding the transportation of drug proceeds by
couriers/mules to Northern California and the flights between
Boston and California used by such individuals.  The

investigators have in particular become familiar with the common characteristics of these couriers/mules, one of which includes last minute reservations for one way or immediate roundtrip travel to a source area for narcotics. Mr. Ormond's travel to and from California is consistent with those patterns and thus is probative evidence connecting the Defendant Currency with drug trafficking.

### b. Packaging of the Defendant Currency

Courts have recognized that "[a] trained and experienced law enforcement agent's belief that the manner in which certain currency was packaged and transported was indicative of drug proceeds is probative and is entitled to weight." *$21,055.00 in U.S. Currency*, 778 F. Supp. 2d at 1104 (quoting *United States* v. *$242,484.00,* 389 F.3d 1149, 1161-62 (11th Cir. 2004) (en banc)). For example, in *United States* v. *Currency, U.S. $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002), the court found it significant that the currency seized was wrapped in cellophane. The court noted that "[u]nlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money. Rather cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs." *Id*. The court further determined that the claimant "offer[ed] no competent evidence suggesting an innocent reason for packaging the currency in this unusual fashion." *Id*.

Mr. Ormond argues that the Ninth Circuit in *Currency, U.S. $42,500.00* "did not hold . . . that unnatural packaging is, *per se*, indicative of a drug nexus." He argues further that the court "was careful to distinguish the cellophane packaging in [that] case from a claimant-favorable case where the Ninth Circuit found currency concealed in packed blue jeans, which 'could not possibly have the same effect' of staving off detection by a drug dog."

Here, the TSA agents described the Defendant Currency as evenly stacked bundles that were strapped to flat pieces of cardboard – similar to the shape and size of a paperback book – which was also covered in carbon-paper and gift wrapped. This type of packaging is more similar to cellophane packaging than it is to packing it in blue jeans. Furthermore, Trooper Tasker, in his affidavit, stated that based on his training and experience, he is "aware that individuals trafficking large amounts of currency from the sale of illegal narcotics often use carbon paper to conceal currency because it is believed that by using carbon paper, edges, and shapes of items intended to be hidden from law enforcement are distorted and therefore are not easily detected."

There may be reasons completely unrelated to drug activity a person may want to conceal money in this fashion. However, Mr. Ormond does not offer any innocent reason for packaging the

Defendant Currency in such a manner.  The manner in which the

Defendant Currency was packaged is probative evidence connecting

it with drug trafficking.

　　　　　*c. Amount of the Defendant Currency*

　　　Courts have also recognized that "[a] large amount of

currency, while not alone sufficient to establish a connection

to a drug transaction, is strong evidence of such a connection."

*$21,055.00 in U.S. Currency*, 778 F. Supp. 2d at 1105 (citing

*United States* v. *$149,442.43 in U.S. Currency,* 965 F.2d 868, 877

(10th Cir. 1992)); *see also Currency, U.S. $42,500.00*, 283 F.3d

at 981 ("We have previously held that possession of a large

amount of cash is 'strong evidence that the money was furnished

or intended to be furnished in return for drugs.'. . .  A large

amount of money standing alone, however, is insufficient . . .

.").  Here, Mr. Ormond was carrying quite a substantial amount

of currency.  He offers no explanation for why he was carrying

this large sum.  The amount is probative evidence connecting the

Defendant Currency with drug trafficking.

　　　　　*d. Inconsistent Statements Regarding the Defendant*
　　　　　　　*Currency*

　　　In *United States* v. *$22,474.00 in U.S. Currency*, 246 F.3d

1212, 1217 (9th Cir. 2001), the defendant's "inconsistent

statements about the money and his reasons for being in Phoenix

tended to support an inference that the money [seized] was drug-

related." To be sure, some courts give less weight to such inconsistencies. In *United States* v. *A) $58,920.00 in U.S. Currency, B) $38,670.00 in U.S. Currency*, 385 F. Supp. 2d 144, 152-53 (D.P.R. 2005), for example, the opinion observed that although "the claimants' somewhat inconsistent answers might be suggestive of possible involvement in some criminal activity, [the court] d[id] not view the inconsistencies as a strong indication of the requisite narcotics nexus." By contrast, however, Mr. Ormond's inconsistencies are significant.

When Mr. Ormond was asked about the Defendant Currency, he initially denied possessing it. He stated that the wrapped items in his luggage were books and that he had no idea that they contained currency. He claimed that he packed his own bag and that it contained the two gift-wrapped books as his cousin's graduation present received from his mother. Mr. Ormond's mother later testified that this purported cousin did not exist. Meanwhile, Mr. Ormond maintained that he did not see his mother wrap the two packages she gave him. However, when pressed about the issue, Mr. Ormond stated that he helped his mother wrap one of the packages. He later stated that he knew the packages contained currency. He also suggested that his mother did not give him the currency nor did she wrap the packages that contained the currency. Rather, he stated that an unnamed family member gave him the currency to give to another unnamed

family member.  Significantly, Mr. Ormond concedes that his statement that he thought the packaged Currency was "books" that his mother gave him as a graduation present for his cousin, was not true.

Mr. Ormond further stated that he stayed with Mr. Antenor the night before his planned flight to Los Angeles and that Mr. Antenor had driven him to the airport prior to his flight. However, when he was asked for Mr. Antenor's address, Mr. Ormond was not able to provide it.  Furthermore, Mr. Antenor, in his deposition, stated that he did not drop Mr. Ormond off at the airport.  These inconsistencies are probative of a connection between the Defendant Currency and drug trafficking.

### e. K-9 Alert of the Defendant Currency

The use of a certified canine can provide probative evidence regarding drug transactions associated with currency. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida* v. *Harris*, 568 U.S. 237, 246, 133 S. Ct. 1050, 1057 (2013); *see also United States* v. *One Lot of U.S. Currency ($36,634),* 103 F.3d 1048, 1056 (1st Cir. 1997) ("Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value."); *$21,055.00 in U.S.*

*Currency*, 778 F. Supp. 2d at 1105 ("A properly trained drug dog's alert to currency is entitled to probative weight.").

It is undisputed that K-9 Charbo has received a number of certifications. Furthermore, Sgt. Silva's affidavit reports that K-9 Charbo's credentials support the conclusion that he is experienced and discriminating and does not alert to circulated currency unless it has recently been in close proximity to a narcotic substance that he has been trained to detect. The narcotic training of all canines with the MSP focuses solely on the odor of narcotics. The canines are trained to respond to the odor of narcotics, and when responding to these odors, there are several changes identifiable by the handler in the behavior of the canine.

On May 26, 2016, K-9 Charbo alerted to a drawer that contained the currency seized from Mr. Ormond. K-9 Charbo's extensive training indicated to his handler, Sgt. Silva, that the $100,000 in U.S. currency, seized from Mr. Ormond, had recently been in close proximity to a narcotic substance that K-9 Charbo was trained to detect. Such evidence is probative of a connection between the Defendant Currency to drug trafficking.

### f. *Mr. Ormond's Criminal History*

I pause to note that Mr. Ormond has not been arrested or charged with any criminal offense, drug-related or otherwise, related to the Defendant Currency seized on May 26, 2016.

Furthermore, no drugs or drug paraphernalia were discovered on Mr. Ormond's person or in his possessions on May 26, 2016. Additionally, there have been no criminal prosecutions linked to the Defendant Currency.

However, "[a] claimant's record of drug activity is a highly probative factor in the forfeiture calculus." *$67,220.00 in U.S. Currency*, 957 F.2d at 286; *see also United States* v. *$121,100.00 in U.S. Currency*, 999 F.2d 1503, 1508 (11th Cir. 1993) ("In view of [the claimant's] history of drug violations, a reasonable person could believe that such illegal activity was in fact the exchange of a controlled substance."). *Compare United States* v. *One Lot of U.S. Currency Totalling $14,665*, 33 F. Supp. 2d 47, 59 (D. Mass. 1998) (finding that the claimant had "no criminal record of any kind for drug activity, nor for that matter any criminal record at all.").

Here, Mr. Ormond's criminal history discloses that he was arrested in Nebraska for possession of marijuana with intent to distribute, possession of drug paraphernalia, and open container. He was then charged with possession of marijuana with intent to distribute on October 20, 2008. Ultimately, Mr. Ormond entered a *nolo contendere* plea to a misdemeanor charge of attempted possession of in excess of one pound of marijuana. Although stale and thin, this aspect of Mr. Ormond's criminal

history is to a modest degree probative of his familiarity with and involvement in the drug trade.

More fundamentally here, unlike in *One Lot of U.S. Currency Totalling $14,665*, 33 F. Supp. 2d at 59, where "the government ha[d] not shown that [the claimant] was doing business or had personal relationships with drug dealers," the United States, through the deposition of the CW, has sufficiently established that Mr. Ormond had current personal and working relationships with drug dealers.

Mr. Ormond disputes the CW's testimony as "not probative of a drug nexus because it is based on unreliable and inadmissible hearsay." Before the enactment of CAFRA raising the government's burden to that of a fair preponderance, the First Circuit emphasized that "[w]hile it is settled that hearsay may be considered by a court in evaluating probable cause to forfeit, there must be a substantial basis for crediting the hearsay." *United States* v. *Parcel of Land & Residence at 28 Emery St., Merrimac, Mass.*, 914 F.2d 1, 5 (1st Cir. 1990). It is unclear whether that holding retains vitality in the First Circuit after CAFRA.

In *United States* v. *$92,203.00 in U.S. Currency*, 537 F.3d 504, 510 (5th Cir. 2008), the Fifth Circuit, however, held that after CAFRA's enactment, "courts may no longer rely on hearsay (absent an exception to the hearsay rule) when deciding the

merits of a civil forfeiture proceeding brought under CAFRA."
*See also United States* v. *Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 197 n.8 (2d Cir. 2013) ("Pre-CAFRA case law recognized an exception, no longer applicable, in civil forfeiture actions to the typical requirement that affidavits be based upon personal knowledge and admissible evidence."). *But see United States v. $291,828.00 in U.S. Currency,* 536 F.3d 1234, 1237 (11th Cir. 2008) (per curiam) (relying on a pre-CAFRA case to permit the Government's use of hearsay). In any event, this legal issue concerning admissibility is not material here.

I conclude that the CW's full deposition was not based on hearsay, rather, the material evidence it provided was the product of the CW's own personal knowledge and interaction with the relevant individuals and referenced statements that were either admissions by Mr. Ormond, or were made by co-conspirators in a drug trafficking business; as such, they are admissible against Mr. Ormond.[3] Moreover, the information the CW provided

---

[3] In making this determination regarding co-conspirator statements by Mr. Ormond and fellow drug distribution conspirators, I have followed the practice I have used for the past 30 years in determining whether proffered co-conspirator statements are admissible. *United States* v. *Dray*, 659 F. Supp. 1426 (D. Mass. 1987), *vacated on other grounds sub nom.*, *United States* v. *Ochs*, 842 F.2d 515, 528-29 (1st Cir. 1988).

regarding the packaging of the Defendant Currency in particular was corroborated by the description given by the TSA agents.

### g. Conclusion

Based on the totality of the circumstances here, the record before me establishes that it is more likely true than not that the Defendant Currency is substantially connected to an illegal transaction, i.e., drug trafficking, and therefore, subject to forfeiture.

### 2. Innocent Owner Defense

The United States further contends that Mr. Ormond, as the claimant, does not qualify as an innocent owner under 18 U.S.C. § 983(d). The innocent owner defense "shifts the burden to the claimant, who must refute the government's prima facie case either (1) by demonstrating that the property was not in fact used for the specified illegal activity or (2) by proving that she (the claimant) did not know about or consent to the illicit activity." *United States* v. *Real Prop., Bldgs., Appurtenances & Improvements at 221 Dana Ave., Hyde Park, Mass.*, 261 F.3d 65, 68 n.2 (1st Cir. 2001).

Mr. Ormond claims that he is "'under no obligation to come forward with evidence of [his] rightful ownership' until the government satisfies its burden" to prove by a preponderance of the evidence that the Defendant Currency is connected to a drug offense. As discussed in Section III.A.(1) above, the United

States has sufficiently satisfied its burden to prove that the Defendant Currency is connected to a drug offense.

In response to the United States' motion for summary judgment, Mr. Ormond filed an opposition memorandum that principally discusses the government's failure to meet its burden. He fails even to mention the "innocent owner" defense in his opposition/cross-motion for summary judgment. Nor does he assert innocent ownership as an affirmative defense in his answer to the United States' complaint. Mr. Ormond has failed to provide any evidence showing that the Defendant Currency was derived by him from a legitimate source. At no point has Mr. Ormond offered to explain the source of the Defendant Currency. Rather, he has provided nothing more than conclusory statements regarding his ownership of the Defendant Currency.

Notably, it is undisputed that in May 2016, Mr. Ormond was not employed. In addition, his mother did not give him the Defendant Currency, as he now concedes, despite his earlier inconsistent statement. It is not disputed that she did not have the financial means to give Mr. Ormond $100,000 in May 2016 and there is no basis to find he had any such means personally to amass that sum. Not only has Mr. Ormond failed to provide evidence demonstrating he is an "*innocent* owner" of the Defendant Currency, he has also failed to provide any evidence that he is even the owner of the Defendant Currency.

**B.    *Mr. Ormond's Motion for Summary Judgment***

In his cross-motion for summary judgment, Mr. Ormond argues two points—"(1) Ormond is the owner of the Defendant Property, $100,000 in United States Currency . . . and (2) The government cannot sustain its burden of proving by a preponderance of the evidence that the Defendant Property is substantially connected to an illegal transaction . . . ."  Significantly, in his memorandum in support of his cross-motion, Mr. Ormond only argues that the evidence produced does not satisfy the United States' burden of proof because the evidence is not probative of a drug connection.  However, Mr. Ormond has offered nothing in support of this argument to rebut the government's substantial showing.

First, Mr. Ormond claims that his nervousness during the interrogation is of little probative value because "many, if not most, individuals can become nervous or anxious when detained by police officers."  *A) $58,920.00 in U.S. Currency, B) $38,670.00 in U.S. Currency*, 385 F. Supp. 2d at 152.  Mr. Ormond's nervousness, however, was not considered in my analysis above. I did, of course, independently attach weight to his inconsistent statements during his encounters with law enforcement.

Mr. Ormond also contends that there is nothing probative of drug distribution involvement in his travels, particularly when

considering his status of traveling on a guest pass.  As I have indicated above, such a status is not the point, what is significant is the failure of Mr. Ormond to provide an explanation more broadly for his travels.

Mr. Ormond's arguments regarding the manner in which the Defendant Currency was packaged and concealed, his alleged lack of income, and the K-9 alert to the Defendant Currency have all been discussed above.  Mr. Ormond has not provided any additional evidence to show that he deserves judgment as a matter of law on the facts that are not disputed.  And he has offered nothing to support an innocent owner defense.[4]

### IV. CONCLUSION

Summary judgment is a moment to test the parties' respective substantive positions.  A party chooses at his risk, no doubt considering the potential for other legal exposure, whether affirmatively to adduce additional evidence in the record.  But a party making such a choice does not have the luxury of waiting to see whether the opposing parties' position is well founded on the summary judgment record as submitted. The

---

[4] A claimant may not delay assertion of an innocent owner defense once the government has put the question in issue through a motion for summary judgment.  If he seeks to assert opposition, he must do so fully both in opposition to the government's motion and in his own motion for summary judgment.

government's position here is well founded and the claimant has failed to provide an adequate rebuttal.

For the reasons set forth above, it is hereby ordered that the United States' motion for summary judgment be granted and Mr. Ormond's motion for summary judgment be denied.


/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE